NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| P.D., et al.<br><br>        Plaintiffs/Counterdefendants,<br><br>v.<br><br>FRANKLIN TOWNSHIP BD. OF ED.<br><br>        Defendant/Counterclaimant. | Hon. Stanley R. Chesler, U.S.D.J.<br><br>Civ. No. 05-2363 (SRC)<br><br>**OPINION** |

**CHESLER, District Judge**

    **THIS MATTER** comes before the Court on cross-motions by Plaintiff and Defendant for Summary Judgment (docket items #19 and 24). The Court having considered the papers submitted by the parties, and for good cause shown, **DENIES** Plaintiff's Motion (docket item #19) and **GRANTS** Defendant's Cross-Motion (docket item #24) for the reasons set forth below.

### I.  BACKGROUND

    This Individuals with Disabilities Education Act ("IDEA") case concerns the school placement for Plaintiff J.D. during the 2004-2005 academic year. The case was brought on J.D.'s behalf by her mother, P.D.. At issue is the Defendant Franklin Township Board of Education's (the "District") refusal to pay for J.D. to be placed at an out-of-district educational facility. Such a placement would be outside the recommendations of the Individual Education Program ("IEP") that the District prepared for J.D. for the 2004-2005 school year. The Plaintiffs contested this

1

IEP at a due process hearing before Administrative Law Judge ("ALJ") Richard F. Wells in December, 2004. On April 14, 2005, the ALJ rendered his opinion, concluding that the "Franklin Township Board of Education provided J.D. with a free appropriate public education in the least restrictive environment for the 2004-05 school year." (ALJ Opinion at 30.) Accordingly, the ALJ denied P.D.'s claims for an "out-of-district placement and compensatory education" for her daughter. (Id.) Subsequently, P.D. filed a *pro se* complaint in this Court on or about May 2, 2005, on behalf of her daughter, challenging the ALJ's findings and decision.

A.      **Individuals With Disabilities Education Act, 20 U.S.C. 1400 et seq.**

The Individuals with Disabilities Education Act ("IDEA") is the vehicle created by Congress to ensure states follow a mandate to provide a "free and appropriate education" ("FAPE") to all disabled children. 20 U.S.C. §1412. "Educational instruction specially designed to meet the unique needs of the handicapped child," coupled with services "necessary to permit the child to 'benefit' from the instruction" constitute a FAPE. Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995).

For each child identified as eligible for special education, a written statement called an Individual Education Program ("IEP") is developed. The IEP, which addresses and includes several elements as provided under 20 U.S.C. §1414(d)(1)(A), is designed to ensure implementation of a FAPE for the child. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 264 (3d Cir. 2003). In addition to defining the content required, IDEA provides that an IEP should be developed considering the strengths of the child, concerns of the parents, and recent evaluations of the child. Id. The team responsible for developing the IEP consists of the child's parent(s), at least one of the child's special education teachers, a curriculum specialist and, if the

parent or school board requests, a person with special knowledge or expertise related to the child's education. Id.; see also 20 U.S.C. §1414(d)(1)(B). IDEA further mandates that the team review the IEP annually "to determine whether the annual goals for the child are being achieved." 20 U.S.C. §1414(d)(4).

Under IDEA, as well as the New Jersey regulations adopted to implement it, there exists a strong preference for mainstreaming, in other words, requiring education in the least restrictive environment. 20 U.S.C. § 1412(a)(5)(A). The Third Circuit has interpreted this requirement to mean "mandating education 'in the least restrictive environment that will provide [the student] with a meaningful educational benefit.'" S.H., 336 F.3d at 265 (quoting T.R. v. Kingwood Twp. Bd. Educ., 205 F.3d 572, 578 (3d Cir. 2000)). "The least restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 535 (3d Cir. 1995).

IDEA does not require that a school district maximize a student's potential or provide the best possible education. Rather, the statutory obligation is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982). The IEP must provide "meaningful" access to education, id. at 192, and confer "some educational benefit" upon the child. Id. at 200. In order to be appropriate, however, this educational benefit must be more than "trivial." Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247 (3d Cir. 1999). An appropriate IEP is "gauged in relation to the child's potential," id., and must offer the potential for "significant learning" and "meaningful benefit." Id.

3

When a parent believes the district has not provided their child with a FAPE as required under IDEA, he or she may object to the IEP and request a due process hearing or a mediation conference. See Lascari v. Bd. of Educ., 116 N.J. 30, 36 (1989) (citing applicable New Jersey state regulations). Traditionally, the burden of proof to demonstrate compliance with IDEA has been upon the school district. The parent(s) needed only place the appropriateness of the IEP at issue, and the burden would shift to the school district to prove that the IEP was indeed appropriate. Recently, however, the Third Circuit has changed this rule. Following the Supreme Court's holding in Schaeffer v. Weast, 126 S.Ct. 528 (2005), the Third Circuit has held that the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." L.E. v. Ramsey Bd. of Ed., 435 F.3d 384, 391 (3d Cir. 2006) (citing Schaeffer, 126 S.Ct. at 537). While the burden of proof now lies with the party seeking relief, the focus of the Court's inquiry remains on evaluating "the IEP actually offered and not one that the school board could have provided if it had been so inclined." Lascari, 116 N.J. at 46. Once an ALJ issues a final order following a due process hearing, the aggrieved party may appeal that decision to a state court of competent jurisdiction or the federal district court. 20 U.S.C. § 1415(c)(2).

**B.    Current Dispute**

The current dispute arises from J.D.'s school placement for the 2004-2005 school year. At issue is the appropriateness of J.D.'s continued placement at the Franklin High School, where she currently attends mainstream classes in U.S. History, Dance, Health, Physical Education, and General Biology in a regular classroom setting and attends classes in English, Basic Geometry, and Spanish in a regular classroom setting with in-class support. J.D.'s current placement is

consistent with the latest IEP the District prepared for her on August 30, 2004.  P.D. contends that the education and support services provided to her daughter by the District have not succeeded in delivering a meaningful educational benefit to J.D. and that she "is falling further behind her peers in her areas of disability while in Special Education in the Franklin Township Schools."  (Pl. Br. at 4.)  P.D. is seeking to have her daughter placed in an out-of-district placement to "provide the Specialist mathematics teaching, counseling to address low self-esteem, an in-depth language processing evaluation, an assistive technology evaluation, supportive tutoring, and compensatory education for [her] daughter."  (Pl. Br. at 25.)

Following are the relevant undisputed facts.  J.D is currently enrolled in the Franklin Township Public School system as a tenth grade student. (Pl. Statement of Testimony before the ALJ at ¶ 1.)  J.D. transferred into the Franklin Township School system from the Edison Township School District in late 2000. (Id. at ¶ 2.)  J.D. was classified as eligible for special education and related services while in the Edison Township School District.  (Id. at ¶ 3.)  In April 1997, she was classified as perceptually impaired.  (ALJ Opinion, at 11, ¶ 6.)  Since that time, she has received the services of speech and resource center instruction.  (Id.)  In March 1999, J.D. was diagnosed with ADHD and an auditory processing disorder.  (Id. at ¶ 7.)  J.D. began using an FM auditory trainer system with earphones in the classroom to alleviate problems associated with her Central Processing Disorder.  (Pl. Statement of Testimony before the ALJ at ¶ 6.)  J.D. continued using this system until it was discontinued when she was in the 7th grade. (ALJ Opinion, at 11, ¶ 9.)

J.D. began high school in the Franklin Township School District in 2003.  (Id. at ¶ 10.) In the ninth grade, J.D. participated in a pull-out replacement resource program for math, and

regular education with out-of-class support for Science and Social Studies for two periods per week. (Pl. Statement of Testimony before the ALJ at ¶ 22.) J.D.'s grades for the ninth grade (2003-2004 school year) ranged from a "95" in Health to a "74" in English. (ALJ Opinion, Ex. P-3 at 2.) Most of her grades were B's. (Id.) While J.D. had some difficulty with mid-term and final exams, her educational evaluation in June 2004 reported that she showed some improvement in her final exams for history, science, English, and dance. (Id.)

On March 24, 2004, an annual IEP review meeting was held to develop an IEP for J.D.'s upcoming 2004-05 school year. (Tr. at 50-51.) An IEP was not agreed upon at that meeting, and P.D. requested that her daughter be re-evaluated prior to agreeing to an IEP for the upcoming school year. (Id. at 51.) On June 30, 2004, Maryann Bailey, M.Ed., a Learning Disabilities Teacher/Consultant with the District conducted an evaluation of J.D. (ALJ Opinion, Ex. P-3 at 1.) The report prepared by the consultant indicated that J.D. was a cooperative and well motivated student who follows the school's rules and completes her assignments with minimal supervision. (Id. at 1-2.) The report also summarized the numerous academic tests that were administered to evaluate J.D.'s performance. (Id. at 3.) These reports indicated that "[w]hen compared to others at her age level, [J.D.]'s ability to apply academic skills is average. Her listening skills are also average. [J.D.]'s performance is above average in reading comprehension and written expression; low average in math reasoning; and low in math calculation skills." (Id. at 5.) The report predicted that J.D. "[w]ill find the performance demands of age-level tasks involving written expression difficult; age-level tasks involving math reasoning will be very difficult; and age-level tasks involving math calculation skills will be very difficult to extremely difficult for her." (Id.)

6

The 2004-05 school year began on August 24, 2004 (ALJ Opinion at 14, ¶ 24) and six days later, the District's IEP team met again on August 30, 2004 to finalize the IEP for J.D.'s 2004-05 school year. (Tr. at 50-51.) The revised IEP presented at the August 30, 2004 meeting offered in-class education with supplementary aids and supports to "meet [J.D.]'s unique needs which include deficits in quantitative concepts, and attention." (ALJ Opinion, Ex. R-2 at 8.) The proposed program had J.D. enrolled in regular classes for U.S. history, dance, health, physical education, and general biology. (Id. at 7.) The IEP also provided for daily in-class resource programs for J.D.'s English, Geometry and Spanish classes. (Id.) J.D.'s mother did not accept the District's recommended program and filled out a form requesting a due process hearing to contest the District's IEP that same day. (ALJ Opinion, Exhibit R-3.) In her request for a due process hearing, P.D. alleged that the District's "program is not able to adequately prepare [J.D.] for graduation or college" and requested that "[J.D.] receive out-of-district placement for her academic needs." (Id.)

On December 8, 2004, the ALJ held a due process hearing on the matter. The ALJ heard testimony from P.D., on behalf of her daughter, as well as testimony presented on behalf of the District by Gloria Albernalli-Wenson, a school psychologist, Maryann Baily, a learning disabilities teacher/consultant, and Paulette Kirchner, a special education teacher. (See Tr.) On April 14, 2005, the ALJ rendered his opinion, concluding that the "Franklin Township Board of Education provided J.D. with a free appropriate public education in the least restrictive environment for the 2004-05 school year" and denying P.D.'s request to order an out-of-district placement for her daughter. (ALJ Opinion at 30.) P.D. brought the current suit to challenge the ALJ's findings, and to allege that the District failed to "ensure that a timely hearing and decision

t[ook] place after [her] request [for] an impartial hearing of the IEP decision" and that the District's IEP was otherwise deficient. (Pl. Br. at 6-7.)

## II. STANDARD OF REVIEW

The motions before the Court are cross-motions for summary judgment, although they are essentially appeals of the ALJ's decision. In considering whether to affirm administrative findings, this Court must first determine the proper weight to accord the ALJ's decision. "[J]udicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." Susan N., 70 F.3d at 757 (citation omitted). In Board of Education v. Rowley, the Supreme Court announced a distinctive standard of review which federal courts must apply when reviewing an ALJ's decisions under IDEA:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sounds educational policy for those school authorities which they review. The very importance with which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought. The fact that § 1415(e) requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

Rowley, 458 U.S. at 206. In short, the purpose of the "due weight" standard is to "prevent the court from imposing its own view of preferable educational methods on the states." Id.

Nonetheless, the deference afforded an ALJ's decision is qualified. The Third Circuit "has interpreted the Supreme Court's instruction in Rowley to require that a court consider – although not necessarily to accept – the administrative fact findings," D.R. v. East Brunswick Bd.

of Educ., 109 F.3d 896, 898 (3d Cir. 1996), "[b]ut if the district court chooses to depart from the agency's ruling, it should provide some explanation for its departure." Carlisle Area Sch., 62 F.3d at 527. Recently, the Third Circuit further defined the meaning of "due weight" and ruled that the proper standard of review of administrative decisions in IDEA cases is "modified *de novo.*" S.H., 336 F.3d at 270. As such, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.' Id. (quoting Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001).

### III. DISCUSSION

**A.**     **The Plaintiffs' Substantive Claims do Not Show That the District Denied J.D. a FAPE**

The Plaintiffs claim that the District failed, at the administrative hearings, to prove "that its previous and proposed IEPs satisfied the requirements of the IDEA and provide [J.D.] with a free and appropriate education." (Pl. Br. at 11.) This claim, however, misstates the burden of proof in these cases. Consistent with Supreme Court precedent, the Third Circuit has expressly held that the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." L.E., 435 F.3d at 391 (citing Schaeffer, 126 S.Ct. at 537). This places the burden of proof with P.D., as the party challenging the District's IEP, to demonstrate that the District's proposed IEP failed to offer her daughter a FAPE.

The Plaintiffs' substantive challenge to the District's IEP is "found in the public school testing that has been done on [J.D.]," relying on the comparative results of two Woodcock-

Johnson Achievement Tests performed on J.D. in 2000 and 2004.  Based on the results of these two tests, P.D. believes that, despite the District's efforts, her daughter is "still testing at the grade level that she was at in 2000."  (Tr. at 222.)  This, the Plaintiff feels, is conclusive proof that "something's not working" because, "if she's being taught[,] then it would be evident in her testing results."  (Id.)

The first of these two tests which form the basis of the Plaintiffs' substantive claims was administered to J.D. on April 4, 2000 (ALJ Opinion, Ex. P-3) and the second was administered on June 30, 2004 (Id., Ex. P-2).  In 2000, P.D. completed a Woodcock-Johnson Revised Achievement test while she was in the fifth grade (grade equivalent of 5.7 years of schooling).  (Id. at P-3.)  The results of this test indicated that P.D. had a grade-equivalent proficiency of 5.0 in calculation, 4.9 in applied problems, 6.3 in writing samples, and a 4.8 in broad math.  (Id.)  The Plaintiffs compare these numbers to the results of a Woodcock-Johnson III test that was administered to J.D. in 2004 when J.D. was in the ninth grade (grade equivalent of 9.9 years of schooling).  (Pl. Br. at 3.)  This later test indicated that J.D. had a grade equivalency of 5.3 in calculation, 5.4 in applied problems, 5.6 in writing samples, and a 5.3 in broad math.  (ALJ Opinion at P-2.)  The Plaintiffs claim that a comparison of these test results demonstrates that "[i]n her areas of weakness, [J.D.] is significantly below grade level in 2004 . . . as compared to 2000 - where she was on grade level." (Pl. Br. at 3.)  This, the Plaintiffs argue, "indicate[s] that [J.D.] is falling further behind her peers in her areas of disability while in Special Education in the Franklin Township Schools."  (Id. at 4.)

The District specifically addressed this issue through the testimony of their expert presented to the ALJ.  Ms. Gloria Albertalli-Wenson, the school psychologist for the Franklin

10

Township Board of Education, presented uncontested testimony that the results from the tests issued in 2000 and 2004 are not readily comparable to one another due to changes in the test itself and the way it was administered. (Tr. at 97-100.) Ms. Albertalli-Wenson noted that the test given in 2004, the Woodcock-Johnson III, was "markedly different" from the Woodcock-Johnson Revised test that was given in 2000. (Id. at 97.) Unlike the test given in 2000, the new version given in 2004 was a timed exam, which limited the amount of time given to the student to answer the questions. This change in the administration of the test makes it difficult, in comparing scores from the two, to ensure you are "comparing apples and apples and oranges and oranges." (Id. at 100.)

      The District also presented expert testimony, which was found to be both credible and compelling by the ALJ, to support their proposition that J.D.'s true capabilities were not being accurately reflected in the numbers from her recent Woodcock-Johnson III test. Maryann Bailey, a learning disabilities consultant and teacher with the Franklin Township Board of Education, noted that other factors certainly contributed to J.D.'s performance beyond what her recent test scores may indicate. (Tr. at 145-46.) For example, while J.D.'s test scores indicate that she was deficient in math skills, she was able to continue in a mainstreamed math class in her public school and able to achieve a 90 in her tenth-grade basic geometry class through the use of in-class support, coupled with J.D.'s own motivation to academically succeed. (Tr. at 145, 159.) Despite J.D.'s learning disabilities, she has been able to achieve passing grades in all her classes, with the support provided through the District's resources, and successfully advance to the tenth grade. She is described by her teachers as being "conscientious and organized in her approach to her studies" (ALJ Opinion, R-2 at 2), and one of J.D.'s teachers noted that J.D.'s "focus, effort,

11

and concern for grades help [her] succeed." (Id.)

The ALJ also heard unanimous expert testimony from the District that the IEP they offered for the 2004-05 school year was "reasonably calculated to confer educational benefit upon J.D." (Tr. at 159 (testimony of Ms. Bailey).) (See also Tr. at 57 (noting expert testimony of Ms. Albertalli-Wenson that "the program that the district developed for J.D.'s '04-'05 school year [was] reasonably calculated for her to receive meaningful educational benefit").) The 2004-05 IEP was tailored to address J.D.'s needs and to accommodate her academic goals by offering her in-class support and additional support classes that "appear[] at this time [to be] meeting [J.D.'s] needs very well." (Id. at 62.) The ALJ also heard testimony regarding J.D.'s progress under the current IEP. Ms. Bailey testified that J.D. was "doing quite well" in the tenth grade. (Tr. at 159.) To date, J.D. was receiving "A's and B's and quite a few A's" under the current IEP. (Id.) While passing grades are not per se conclusive in determining that J.D. received a proper educational benefit from the District's IEPs, such educational progress strongly suggests that J.D. was receiving such an educational benefit. See Rowley, 458 U.S. at 202-03.

The Plaintiffs offered nothing substantive to refute the expert testimony and other evidence presented by the District regarding the appropriateness of the IEP offered to J.D. for the 2004-05 school year. The only testimony presented by the Plaintiffs before the ALJ was that of P.D., J.D.'s mother. P.D. acknowledged that, in J.D.'s current tenth grade math class, her daughter has been able to maintain a B in her mainstreamed class for the first two and a half months of the new semester, and has been able to "hold her own" with the other students in her grade. (Tr. at 218-19.) Her challenge to the District's IEP is based solely on her belief that "the grades are misleading" because she doesn't "know how the grades are derived" and she doesn't

12

believe that they "truly measure [J.D.'s] progress at grade level." (Id. at 219.) The underlying basis for this claim is P.D.'s assertion that, based on her comparison of the two Woodcock-Johnson tests administered to her daughter in 2000 and 2004, her daughter is "still testing at the grade level that she was at in 2000." (Id. at 221-22.)

The ALJ was understandably reluctant to accept the lay opinion of J.D.'s mother as sufficient to refute the unanimous testimony of the District's educational experts. (ALJ Opinion at 27 (noting that "petitioner's 'feelings' and 'beliefs' that J.D.'s current placement was not appropriate were wholly unsatisfactory to challenge the trustworthiness of respondent's experts").) As noted by the Supreme Court in Rowley, "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" Rowley, 458 U.S. at 208 (quoting San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 42 (1973)). This is why courts must, by necessity, rely upon the determinations of experts in the field of special education to evaluate the appropriateness of an IEP. Obierti by Obierti v. Bd. of Educ. of Borough of Clemington School Dist., 995 F.2d 1204, 1216 (3d Cir. 1993) (noting need for courts to "rely heavily on the testimony of educational experts"). The testimony of a student's mother, who is not herself an expert in the field of special education, does not qualify as sufficient to rebut the unanimous expert opinions presented by the District in this case. Johnston by Johnston v. Ann Arbor Public Schools, 569 F.Supp. 1502, 1509 (D.C.Mich. 1983) (noting that "it would be inappropriate to substitute the opinion of the mother [for the opinion of the school district experts] as it would be to substitute the opinion of the judge.").

Even assuming, *arguendo*, that P.D. is correct in her assertion that the results of these two tests are both conclusive and comparable, and that J.D. has made little or no academic progress

13

over the past four years under the District's prior IEPs - this has no bearing on whether the current IEP for the 2004-05 school year is appropriate. Carlisle Area School v. Scott P., 62 F.3d 520, 530 (3d Cir. 1995). Appropriateness of a contested IEP is judged prospectively, so lack of progress under past IEPs does not render the current IEP proposed by the District inappropriate. Id. The sole basis for the Plaintiffs' challenge to the District's current IEP, however, is based upon a non-expert comparison by P.D. of two past test results. This is insufficient to carry her her burden of demonstrating that the 2004-05 IEP offered by the District did not offer her daughter a "free appropriate education ('FAPE')." L.E., 435 F.3d at 389 (citing T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 2000) (citations omitted)).

**B.     The Plaintiffs' Claims of Procedural Violations do Not Amount to Denial of a FAPE.**

In her papers, P.D. alleges numerous procedural violations that she claims deprived J.D. of "the educational opportunity that the procedural requirements of the IDEA were intended to protect." (Pl. Br. at 25.) These alleged violations include failure of the District to "ensure a timely decision in the administrative matter," and that the failure to include "a statement of [J.D.'s] present levels of educational functioning, . . . a statement of objective strategies to evaluate progress, . . . [or] a statement of whether the IEP team considered [J.D.'s] statewide/districtwide assessment when developing the IEP" in the IEP document itself. (Id. at 24-25.)

To claim that a procedural inadequacy constitutes a denial of a FAPE, however, the Plaintiffs must demonstrate that these inadequacies either resulted in "the loss of educational opportunity, Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir.1990), or seriously infringe the parents' opportunity to participate in the IEP formulation process, Roland

M. v. Concord School Committee, 910 F.2d 983, 994 (1st Cir. 1990); Hall by Hall v. Vance County Bd. of Educ., 774 F.2d 629, 635 (4th Cir. 1985)." W.G. v. Board of Trustees of Target Range School Dist. No. 23 Missoula, Montana, 960 F.2d 1479, 1484 (9th Cir. 1992).  See also Doe v. Defendant I, 898 F.2d 1186, 1190 (6th Cir. 1990) (noting that, in order to set aside an IEP, the Court must find some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits).  For the reasons stated above, the Plaintiffs have failed to demonstrate that any alleged procedural inadequacies resulted in the loss of any educational opportunity for J.D. because they failed to show that the District's proposed IEP for the 2004-05 school year did not offer J.D. a proper FAPE.

The Plaintiffs also fail to show that any alleged procedural inadequacies hampered the parents' opportunity to participate in the formulation process of the District's IEPs.  As the ALJ aptly summarized in his opinion:

> From a purely procedural standpoint, I FIND that there were no failings on the part of respondent, nor were there any procedural bars that in any way hampered the opportunity to participate in the IEP formulation process. The record adduced during the hearing established that J.D.'s mother attended the last two IEP meetings, but refused to concur in the program proposed. With regard to the last IEP meeting of August 30, 2004, J.D.'s mother refused to sign the attendance sheet, but nevertheless did attend the meeting. I am satisfied that respondent followed the procedure requirements under the IDEA. There was no evidence produced or established or even tended to establish any procedural inadequacy that could have hampered the parent's opportunity to participate in the formulation of J.D.'s IEP, or otherwise caused a deprivation of educational benefits to J.D.

(ALJ Opinion, at 29.)  Accordingly, this Court finds that the Plaintiffs' claims of procedural defects which deprived J.D. of a proper FAPE for the 2004-05 school year are without merit.

## IV. CONCLUSION

As required by the standard, this Court has reviewed the evidence in the record, as well as the ALJ's assessment of the arguments raised by the parties and his findings based on the testimony and written exhibits before him.  Having done so, this Court finds, based on a preponderance of the evidence in the record, that the Plaintiffs have failed to meet their burden of proof to establish that the IEP placement recommendations made by the District failed to offer J.D. a free and appropriate education.  As such, J.D.'s parents are not entitled to the relief that they seek, namely to have their daughter placed in an out-of-district placement at the District's expense.  The Plaintiffs' Motion is hereby **DENIED**, and the Defendant's Motion is hereby **GRANTED**.  An appropriate form of order will be filed herewith.


Dated:  March 22, 2006

    /s Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.